**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAMIE R. WHITESEL<br>6060 Baghdad Place, Box 310<br>Dulles, VA 20189,<br><br>Plaintiff,<br><br>v.<br><br>MARCO RUBIO, Secretary,<br>U.S. Department of State<br>2201 C Street, N.W.<br>Washington, DC 20520,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br><br>**Jury Demand** |

## COMPLAINT

1. Plaintiff Jamie R. Whitesel ("Ms. Whitesel"), by and through undersigned counsel, hereby submits this Complaint against Defendant Marco Rubio, Secretary of State, U.S. Department of State (the "Department" or "Agency"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et seq*. ("Rehabilitation Act"). Ms. Whitesel seeks all remedies and relief available under Title VII and the Rehabilitation Act for harms caused to her by the Department's unlawful discrimination on the basis of her sex (female) and disability, and unlawful retaliation for her prior protected Equal Employment Opportunity (EEO) activity.

2. This action arises from a sustained pattern of sex-based and disability-based discrimination, harassment, and hostile work environment that Ms. Whitesel endured during her assignment at U.S. Embassy Beirut, including disparate treatment in the form of constructive curtailment from her position, denial of promotion, manipulation of her performance evaluation, exclusion from professional opportunities, and continuing retaliation. Ms. Whitesel brings eight

causes of action for discrimination and retaliation based on sex and disability, including both disparate treatment and harassment/hostile work environment under Title VII and the Rehabilitation Act.

3.  Ms. Whitesel has exhausted her administrative remedies through the Department's EEO process and now seeks injunctive and equitable relief, including expungement of the discriminatory and retaliatory 2022 Employee Evaluation Report from her file and/or Official Personnel Folder (OPF), retroactive promotion to FS-04 effective the 2022 promotion cycle,, compensatory damages to the maximum allowed by law, back pay, front pay, reasonable attorney fees, costs, and expenses, medical expenses, and such other relief as the Court deems just and appropriate to fully remedy the Department's unlawful conduct.

**PARTIES**

4.  Plaintiff Jamie R. Whitesel is a United States citizen and has been employed by the U.S. Department of State since January 2015. Ms. Whitesel is a Foreign Service employee who served as an Office Management Specialist (OMS) at the U.S. Embassy Beirut, Lebanon from July 2021 to July 2024.

5. Ms. Whitesel is female and has a mental disability (Adjustment Disorder with Depression and Anxiety). She currently resides at 6060 Baghdad Place, Box 310, Dulles, VA 20189.

6. The Department of State is an executive agency of the United States government headquartered at 2201 C Street NW, Washington, DC 20520, and is subject to Title VII of the Civil Rights Act of 1964, as amended, and the Rehabilitation Act of 1973, as amended.  Defendant Marco Rubio is the Secretary of the United States Department of State and is sued in his official capacity only.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 because it presents a federal question.

8. This Court has jurisdiction over Ms. Whitesel's Title VII claims pursuant to 42 U.S.C. §§ 2000e-16(c) and 2000e-5(f)(3), which authorize federal sector employees to bring civil actions in federal district court after exhaustion of administrative remedies.

9. This Court has jurisdiction over Ms. Whitesel's Rehabilitation Act claims pursuant to 29 U.S.C. § 794a(a)(1), which incorporates the remedies, procedures, and rights of Title VII.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3). The Department of State is headquartered in the District of Columbia at 2201 C Street, N.W., Washington, DC 20520. Significant employment decisions affecting Ms. Whitesel were made by Agency officials located in the District of Columbia, including promotion determinations by the Director General, performance evaluation approvals by the Bureau of Global Talent Management, and policy decisions regarding assignments and personnel actions.

## ADMINISTRATIVE EXHAUSTION

11. Ms. Whitesel has fully exhausted her administrative remedies as required by Title VII and the Rehabilitation Act, 42 U.S.C. § 2000e-16(c) and 29 U.S.C. § 794a(a)(1), and is entitled to bring this civil action in federal district court.

12. On October 11, 2022, Ms. Whitesel timely contacted an EEO Counselor at the U.S. Embassy Beirut, Lebanon, within 45 days of the alleged discriminatory acts, in accordance with 29 C.F.R. § 1614.105. The EEO Counselor was Yassin AbdulleOmar.

13. On January 10, 2023, Ms. Whitesel received a Notice of Right to File a Formal Complaint of Discrimination.

14. On January 23, 2023, within 15 days of receiving the Notice of Right to File, Ms. Whitesel filed a timely formal EEO complaint with Department of State, Office of Civil Rights (S/OCR), which was assigned Agency Case Number DOS-0011-23, in accordance with 29 C.F.R. § 1614.106.

15. On February 28, 2023, the Department accepted Ms. Whitesel's formal complaint for investigation and reformulated the language of the accepted claims on March 9, 2023. Ms. Whitesel subsequently amended her complaint on June 27, 2023 to include additional related claims arising from a continuing course of discriminatory conduct.

16. The Department provided Ms. Whitesel with a Report of Investigation on November 20, 2023. Ms. Whitesel timely requested a hearing before an EEOC Administrative Judge on December 20, 2023, and her case was assigned EEOC Case Number 570-2024-00317X and assigned to Administrative Judge (AJ) Christian Hall.

17. On February 9, 2026, AJ Hall granted the Department's motion for summary judgment, and on February 11, 2026, the Department issued a final order implementing that decision, dismissing Ms. Whitesel's EEO complaint and triggering the right to file this Complaint within 90 days, i.e., by May 12, 2026. On February 19, 2026, the Department issued a corrected final order, again dismissing Ms. Whitesel's EEO complaint and triggering new appeal rights, e.g., filing this Complaint within 90 days, i.e., by May 20, 2026. This Complaint is being timely filed (on or before May 20, 2026).

## FACTS

18. Ms. Whitesel has been employed by the U.S. Department of State since in or about January 2015. Throughout her career, Ms. Whitesel has served as an Office Management Specialist (OMS) in the Foreign Service, a position that leads and performs a wide range of administrative,

operational, and technical support functions which facilitate the overall efficiency, effectiveness, and accomplishments of the organization.

19. From in or about January 2015 through July 2021, Ms. Whitesel received positive performance evaluations and maintained an unblemished record of service with no performance issues or disciplinary actions. Ms. Whitesel was competitively promoted to FS-05 in 2019, ahead of the majority of her 2015 entering OMS cohort and was recommended for promotion to FS-04 by the 2021 Foreign Service Selection Board on her first look, ahead of her cohort, at the U.S. Department of State.

20. In July 2021, Ms. Whitesel reported to her assignment at U.S. Embassy Beirut, Lebanon, as the Office Management Specialist for the Political-Economic (P/E) Section. Ms. Whitesel spent 80 percent of her time supporting Political-Economic Counselor Janae E. Cooley (Ms. Cooley), who served as Section Chief and second-level supervisor ("reviewer" on performance evaluations). Deputy Political-Economic Counselor Amy L. Smith (Ms. Smith) was Ms. Whitesel's direct supervisor ("rater" on performance evaluations). Deputy Chief of Mission Richard Michaels (Mr. Michaels) was Ms. Whitesel's third-level supervisor and Ms. Cooley's direct supervisor.

21. On or about August 8, 2021, shortly after arriving at post, Ms. Whitesel was temporarily pulled up to serve as the Ambassador's Office Management Specialist, a higher-graded position, for approximately six weeks. This assignment demonstrated Ms. Whitesel's competence and professional capabilities. Ms. Whitesel successfully completed this assignment and returned to the P/E Section on or about September 20, 2021.

22. Ms. Whitesel has a mental disability, specifically Adjustment Disorder with Depression and Anxiety, for which she was diagnosed in approximately 2005. Ms. Whitesel

5

manages her condition through treatment and medication. On September 23, 2021, Ms. Whitesel requested Ms. Cooley's for permission to leave work early for an appointment with her therapist.

23. Beginning in or about mid-September 2021 – within days of Ms. Whitesel's return from her assignment to the Ambassador's office – Ms. Cooley alleges she began documenting a purported performance and conduct issues list attributed to Ms. Whitesel. September 24, 2021, one day after Ms. Whitesel's mental health disclosure, is the date of the first alleged performance issue recorded by Ms. Cooley.

24. Beginning in August 2021, and upon Ms. Whitesel's return to the P/E Section in September 2021, Ms. Cooley subjected Ms. Whitesel to differential and disparate treatment based on her sex. Ms. Cooley required Ms. Whitesel to perform degrading personal tasks that were not part of Ms. Whitesel's professional duties and were not required of male personnel. These tasks included, among other things, walking Ms. Cooley's dog, providing dog care, cleaning Ms. Cooley's spilled food, ordering Ms. Cooley's lunch, being made to crawl underneath Ms. Cooley's desk to collect papers Ms. Cooley threw on the floor every night, planning and arranging weekend activities for Ms. Cooley and her husband, making personal appointments, tending to Ms. Cooley's husband's logistical needs, and arranging services for Ms. Cooley's residence.

25. Two other female subordinates who worked under Ms. Cooley's supervision were subjected to similar gendered domestic-service task assignments that included dog walking, cleaning out Ms. Cooley's residence refrigerator, and mailing personal packages, establishing a pattern of sex-based discrimination. The Department's Office of Civil Rights, through its Anti-Harassment Program, formally found that Ms. Cooley engaged in "sex-based harassment" because she was "harsher to women than men, and was so more frequently," and seemingly target[ed subordinates] because of their sex." The Anti-Harassment Program found that "no reasonable

person working in [Ms. Cooley's] section would have been able to focus on the mission, or get their work done, given her behaviors." The Anti-Harassment Program (AHP) substantiated that Ms. Cooley harassed multiple female subordinates, including Ms. Whitesel. The specific details of the findings are found in a Report dated February 28, 2025, and include extensive witness interviews of women who experienced harassment based on their sex by Cooley.

26. From on or about September 20, 2021 through December 7, 2021, Ms. Cooley subjected Ms. Whitesel to a pattern of blame-shifting, public criticism, and fabrication of performance issues. On or about October 12-16, 2021, Ms. Cooley provided Ms. Whitesel with an incorrect date for her husband's airport pickup, then blamed Ms. Whitesel for the resulting confusion and sent accusatory emails to other personnel at post.

27. On October 20, 2021, Ms. Whitesel began taking screenshots of Ms. Cooley's calendar fearing Ms. Cooley was manipulating her calendar to frame Ms. Whitesel for errors.

28. On or about October 27, 2021, Ms. Cooley instructed Ms. Whitesel to submit Special Compensatory Time (SCT) requests on Ms. Cooley's behalf. Ms. Whitesel correctly raised to Ms. Cooley that Ms. Cooley was ineligible for the requested SCT because she exceeded the pay cap, as corroborated by the Department's subject matter expert on or about June 12, 2025. In response, Ms. Cooley told Ms. Whitesel it wasn't Ms. Whitesel's job to determine her eligibility, it was her job to fill out Ms. Cooley's paperwork. However, per 4 FAH-3 H-525.3-2, as a timekeeper it was Ms. Whitesel's job to confirm premium compensation was authorized prior to recording it. When Ms. Whitesel sought support from the Deputy Chief of Mission Richard Michaels (Mr. Michaels), he told Ms. Whitesel "it was too much math."

29. On November 1, 2021, Ms. Cooley's calendar indicated she met with Human Resources Officer Caren A. Brown (Ms. Brown). On November 2, 2021, just before Ms. Whitesel

went on leave, Ms. Cooley emailed Ms. Whitesel alleging multiple non-specific performance errors and directing her to have a counseling session with Ms. Smith as her rater—which was the first time Ms. Whitesel was informed that Ms. Smith was her rater—and three minutes later, Ms. Cooley forwarded to Ms. Brown the email regarding Ms. Whitesel, stating "keep [it] in your back pocket."

30. On information and belief, on November 3, 2021, while Ms. Whitesel was still on administrative leave, Ms. Smith, Ms. Brown, and Ms. Cooley had a meeting regarding Ms. Whitesel.

31. On November 5, 2021, Ms. Smith, Ms. Brown, and Management Officer Catherine Connell had yet another meeting regarding Ms. Whitesel, immediately after which, Ms. Connell physically confronted Ms. Whitesel at her desk. Ms. Connell physically placed herself in front of the only exit from Ms. Whitesel's desk, invaded her personal space, and accused her of lying until Ms. Whitesel was in tears while Ms. Brown watched without intervening. This incident constituted workplace violence under Department policy 3 FAM 4154. Following the incident, Ms. Whitesel sought a meeting with Mr. Michaels to discuss her concerns regarding Ms. Cooley's and Ms. Connell's escalating hostility towards her.

32. Later on November 5, 2021, Ms. Cooley emailed Ms. Connell, Ms. Brown, and Ms. Smith, and included a message which Ms. Cooley sent to Ms. Whitesel four minutes earlier, inquiring about a meeting on Ms. Cooley's calendar, concluding before Ms. Whitesel was able to respond that Ms. Whitesel made an error. Ms. Cooley falsely stated in her email to Ms. Connell, Ms. Brown, and Ms. Smith that Ms. Whitesel had failed to arrange transportation for Ms. Cooley when in fact Ms. Whitesel did arrange transportation. In the same email, Ms. Cooley alleged it was the third error Ms. Whitesel made that day, and contemplated changing Ms. Whitesel's reporting

8

structure, supporting "100% whatever needs to be done" with Ms. Whitesel's "rater and reviewer structure" so Ms. Cooley could engage with Ms. Whitesel on her alleged performance issues.

33.  On November 8, 2021, Ms. Cooley publicly screamed at and threatened Ms. Whitesel in the Chancery foyer doorway that Ms. Cooley was taking over as Ms. Whitesel's rater so she could deal with Ms. Whitesel's performance issues personally. Ms. Whitesel disclosed to Ms. Cooley and Ms. Smith that she was burnt out and planned to take leave, and informed Ms. Smith of her intent to see the doctor to address any medical issues that might be contributing. Later that day, Ms. Cooley forwarded Ms. Whitesel's burnout disclosure to Ms. Brown and Ms. Connell.

34.  On or about November 9, 2021, one day after Ms. Whitesel's disclosure of burnout and requested leave, Ms. Brown sent an email to Ms. Cooley and Ms. Smith outlining a plan to build adverse documentation against Ms. Whitesel. Ms. Brown described creating performance documentation "essentially the same idea as a Performance Improvement Plan (PIP)" and stated "other punitive actions" were "rare and almost non-existent" for U.S. direct hires. Ms. Brown wrote "it is imperative that we take action soon" and that "the status of [Ms. Whitesel's] position is ultimately going to lie with her EER [Employee Evaluation Report] and any resulting actions, voluntary or involuntary, due to its content," contemplating Ms. Whitesel's departure.

35.  On November 9, 2021, Ms. Smith emailed Ms. Whitesel requesting a copy of her Work Requirement Statement (WRS). Ms. Whitesel responded that she did not receive a WRS when she started and would ask her predecessor Margaret Langer (Ms. Langer) for a copy of hers. Ms. Whitesel obtained Ms. Langer's position description and core work responsibilities and forwarded them to Ms. Smith.

36. On November 12, 2021, while Ms. Whitesel was on approved leave following her November 8, 2021 disclosure of burnout, Ms. Cooley emailed Ms. Whitesel and Ms. Smith

regarding an after-hours request. Ms. Cooley asserted that Ms. Whitesel had not acted on the request and demanded that Ms. Whitesel, Ms. Smith, and Ms. Cooley meet to address the matter upon her return from leave.

37. On or about November 15, 2021, Ms. Smith warned Ms. Cooley that complaints about female subordinates could be perceived as "having an issue with women." Ms. Brown instructed Ms. Smith to "watch [Ms. Cooley] closely" instead of initiating formal reporting as required by Department policy.

38. On November 16, 2021, Ms. Whitesel emailed Ms. Smith requesting extended leave. Ms. Whitesel stated that she had "seen the doctor and [was] having some issues that are being exacerbated at the moment." Ms. Smith responded by email, confirming in writing that Ms. Whitesel was taking approved sick leave from November 17-26, 2021.

39. On or about November 18, 2021, Complainant updated her approved leave to reflect sick leave from November 17-26, 2021, and upon Ms. Whitesel's return, she provided Ms. Smith a sick note from the State Department's Regional Medical Officer - Psychiatrist, confirming the medical necessity of her sick leave for medication adjustment. On November 30, 2021, Ms. Smith forwarded that note to Ms. Brown.

40. On November 19, 2021, one day after Ms. Whitesel submitted the formal leave form documenting her approved sick leave, Ms. Cooley produced a multi-page list of alleged performance deficiencies titled "Performance and Conduct examples for Jamie Whitesel."

41. Ms. Cooley admitted under oath that the November 19, 2021 deficiency document was "informal," not "absolutely factual," and not something she would "submit in a court." The list included a fabricated allegation that Ms. Whitesel "conducted a counseling session with her

therapist on her work phone at her workstation during work hours." Ms. Cooley later admitted that she "did not know whether [Ms. Whitesel] was on the phone with her therapist."

42. Also on November 19, 2021, Ms. Whitesel attended the Marine Corps Ball, an after-hours embassy social event. At the event, Ms. Cooley publicly humiliated Ms. Whitesel, and Ms. Whitesel was ostracized by her colleagues. Ms. Cooley and others cleared the dance floor and cast hostile looks at Ms. Whitesel after she entered.

43. Shortly after November 19, 2021, Ms. Whitesel learned that false rumors of a sexual nature were being spread about her, specifically that she was sleeping with the boyfriend of a colleague. (Ms. Whitesel, her colleague, and the boyfriend all lived on the embassy compound.)

44. The Anti-Harassment Program investigation revealed that numerous sexualized comments and rumors were started and spread on or about late 2021 through on or about April 2022 by Ms. Cooley about Ms. Whitesel. These rumors included false claims that there was "always a line of men at [Ms. Whitesel's] desk" - insinuations that Ms. Whitesel was involved in sexual relationships with colleagues. Ms. Cooley told Ms. Smith that she had seen Ms. Whitesel kissing a man at the embassy gate one morning, implying Ms. Whitesel was leaving a one-night stand before work. The sexualized rumors continued to circulate through September 2022 and later.

45. On or about November 29, 2021, Ms. Whitesel met with Ms. Smith to discuss the hostile work environment created by Ms. Cooley on the basis of her gender and disability and its impact on her ability to perform and the threats of professional harm. Ms. Whitesel provided Dr. Welsby's doctor's note confirming the medical necessity of her sick leave for medication adjustment. In addition, on or about November 30, 2021, Ms. Whitesel met with Mr. Michaels about the same issues that she had discussed with Ms. Smith.

46. On or about December 1, 2021, Ms. Whitesel met with Ms. Brown to discuss the hostile work environment created by Ms. Cooley on the basis of her gender and disability. Ms. Whitesel stated her concern about Ms. Cooley's impact on her career and Employee Evaluation Report (EER), a performance assessment used in the U.S. Foreign Service. Ms. Brown informed Ms. Whitesel that she had "plenty of time to correct the issues before the evaluation period ended and not to worry about her EER," contradicting the urgency in the November 9, 2021 email.

47. On or about December 2, 2021, Ms. Smith emailed Ms. Whitesel the first draft of her Work Requirement Statement (WRS). Ms. Whitesel did not receive a WRS prior to this date. The document properties show that Ms. Cooley owned and authored the document, and the metadata lists the creation date as November 15, 2021.

48. Ms. Cooley authored Ms. Whitesel's Position Description, which directed Ms. Whitesel to provide "primary support to the Political Economic Counselor." Ms. Cooley was the Political Economic Counselor. Ms. Cooley authored four Specific Objectives; three of the four required Ms. Whitesel to perform tasks defined by reference to Ms. Cooley.

49. On December 3, 2021, Ms. Whitesel emailed Ms. Smith proposed edits to the Specific Objectives. Ms. Whitesel's edits dedicated one objective to supporting Ms. Cooley and three objectives to supporting the section. Ms. Smith approved the edits.

50. On or about December 2, 2021, Ms. Whitesel sent a detailed email to Ms. Smith documenting the pattern of harassment, reporting that she felt "very threatened and afraid" due to Ms. Cooley's conduct and that it was "too much to handle." This constituted protected activity.

51. A few days later, on or about December 7, 2021, while Ms. Whitesel was on leave, she was required to come into the office and was berated by Ms. Cooley for approximately one hour, in the presence of Ms. Smith and Ms. Brown. Ms. Cooley told Ms. Whitesel during that meeting,

"There is a Post for everyone, but not everyone is for every Post," which Ms. Whitesel understood as a threat regarding her continued employment.

52. Ms. Whitesel took leave from December 6, 2021 to January 3, 2022 to seek respite from the discriminatory work environment.

53. On or about December 23, 2021, Ms. Cooley rejected the revised Work Requirements Statement that Ms. Smith and Ms. Whitesel had agreed upon on December 3, 2021.

54. Between December 27 and December 29, 2021, while Ms. Whitesel was on leave, Ms. Smith, Ms. Brown, and Ms. Cooley drafted a "Specific Work Duties and Deliverables" document. The "Performance Expectations" / "Office Etiquette" section was built line-for-line on the November 19, 2021 fabricated performance and conduct issues list drafted by Ms. Cooley. This document functioned as a pseudo Performance Improvement Plan (PIP).

55. On December 29, 2021, the email record reflected the Work Requirements Statement as "reviewed (and signed off on) by Janae" (Ms. Cooley).

56. On January 4, 2022, Ms. Whitesel returned to work following her leave. Ms. Smith presented Ms. Whitesel with a revised Work Requirements Statement, "Specific Work Duties and Deliverables" outline including a "Performance Expectations" / "Office Etiquette" list. The Work Requirements Statement was substantially identical to the version Ms. Cooley had drafted on November 15, 2021. It did not reflect the December 3, 2021 revisions Ms. Whitesel and Ms. Smith had agreed to. The performance document functioned as a pseudo PIP.

57. At the January 4, 2022 meeting, Ms. Smith told Ms. Whitesel that, after taking the Department's required EEO course on December 3, 2021, she had recognized Ms. Cooley's behaviors toward Ms. Whitesel as examples of bullying and harassment as described in the course.

58. When Ms. Whitesel questioned Ms. Smith about the directive limiting personal calls, Ms. Smith stated that Ms. Whitesel had called her therapist from the office. Ms. Whitesel denied this. Ms. Smith responded: "Why would Janae say that?" Ms. Whitesel told Ms. Smith that Ms. Cooley's behavior had crossed the line into harassment.

59. Following the January 4, 2022 meeting, Ms. Smith emailed Ms. Brown that Ms. Whitesel had felt "attacked" by the "duties/performance expectations document." Ms. Brown replied: "[Ms. Whitesel] needs to stop feeling sorry for herself. … My patience is waning with her. … I'm sorry but she is in for a rude awakening."

60. On January 11, 2022, Ms. Brown met with Ms. Whitesel and acknowledged that Ms. Cooley's behavior was bordering on harassment. Ms. Whitesel told Ms. Brown that Ms. Cooley's behavior crossed the line into harassment. This report of harassment by Ms. Whitesel constitutes additional protected activity.

61. Neither Ms. Smith nor Ms. Brown contacted OCR despite their mandatory reporting requirement per Agency regulations (e.g., 3 FAM 1525).

62. The November 19, 2021 list included an allegation that Ms. Whitesel "conducted a counseling session with her therapist on her work phone at her work station during work hours." The January 4, 2022 pseudo PIP directed Ms. Whitesel to "limit personal calls at work — or take outside of the office to ensure privacy;" an earlier-drafted version of that directive included the parenthetical "or medical-related calls."

63. The November 19, 2021 list also included an allegation that Ms. Whitesel had "multiple regular visitors to the office from other sections." Three witnesses testified that Ms. Cooley framed Ms. Whitesel's office visitors in sexualized terms, including the statement that

14

"there is always a line of men at [Ms. Whitesel's] desk." Ms. Cooley did not speak about Ms. Whitesel's male colleagues in the same manner.

64. The January 4, 2022 pseudo PIP directed Ms. Whitesel to "limit personal exchanges with other employees during work hours." Two other female subordinates of Ms. Cooley testified to being subject to measures Ms. Cooley imposed restricting their access to senior officials in the Front Office. The January 4, 2022 pseudo PIP directed Ms. Whitesel to "[r]eceive prior approval from Deputy P/E Counselor for leave and special detail (i.e. Front Office)."

65. On or about January 27, 2022, Ms. Cooley publicly criticized Ms. Whitesel's work product on a phone call and followed up with team emails that caused Ms. Whitesel public embarrassment and reputational harm.

66. As early as November 2021 and continuing through May 2022, Ms. Whitesel was also subjected to the "silent treatment" by Ms. Cooley, excluded from communications, and ostracized both professionally and socially at post.

67. For example, on or about July 12, 2022, Ms. Cooley removed Ms. Whitesel from the P/E Section's P/E Americans WhatsApp group, excluding her from critical work communications in a high-threat environment.

68. Ms. Whitesel engaged in protected activity throughout this period by opposing discriminatory practices and participating in EEO processes. Ms. Whitesel's protected activities included: (1) reporting Ms. Cooley's harassment to Ms. Smith, Ms. Brown, and Deputy Chief of Mission Richard Michaels; (2) requesting medical leave and accommodations related to her disability; and (3) filing internal complaints and ultimately filing a formal EEO complaint.

69. In or about October 11, 2022, Ms. Whitesel contacted an EEO Counselor to initiate the EEO complaint process. On October 31, 2022, Ms. Whitesel also reported harassment to the Office of Inspector General during an inspection at Embassy Beirut. On January 23, 2023, Ms. Whitesel filed a formal EEO complaint.

70. Following Ms. Whitesel's protected activities, the Department subjected her to a series of adverse personnel actions affecting identifiable terms and conditions of her employment intended to punish her for opposing discrimination and participating in EEO processes.

71. During the March through May 2022 Employee Evaluation Report (EER) drafting process, Ms. Smith declined to recommend Ms. Whitesel for promotion, citing Ms. Whitesel's "interpersonal challenges" with Ms. Cooley.

72. When asked why Ms. Smith stated, "Because the others are able to manage their relationship with her." Ms. Smith told Ms. Whitesel on April 20, 2022 that she would not be recommended for promotion.

73. On or about April 26, 2022, Ms. Smith drafted Ms. Whitesel's Area for Development for the 2022 Employee Evaluation Report, stating in part: "[Ms. Whitesel] is exceptionally collaborative and is always willing to pitch in to help the team achieve its goals."

74. On or about May 5, 2022, Ms. Smith revised Plaintiff's Area for Development to: "[Ms. Whitesel] has provided essential support to the Political-Economic team during her first year in Beirut."

75. Ms. Smith also declined to use the Special Circumstances section of the 2022 Employee Evaluation Report to document Ms. Cooley's harassment, later testifying under oath: "It would not have helped [Ms. Whitesel] get promoted." The DS-5055 instructions provide that the

Special Circumstances section is intended to capture unusual or unpredictable circumstances that altered operational conditions and affected the employee's ability to perform.

76. While covering as the Ambassador's Office Management Specialist (OMS) for approximately six weeks in August and September 2021, Ms. Whitesel coordinated the Ambassador's engagements with the President, the Prime Minister, the Speaker of the Parliament, and the Chief of Defense; supported a U.S. Senate Congressional Delegation including overnight hosting at the Chief of Mission Residence; and organized a multinational dinner attended by twelve heads of mission and senior officials. The Ambassador wrote to Ms. Whitesel on August 11, 2022: "You are a rock star. Thank you for stepping up and stepping in to fill in so seamlessly…Please remind me when it's EER time and I will gladly contribute a paragraph to sing your praises."

77. Ms. Cooley, serving as the reviewing officer for Ms. Whitesel's 2022 EER, refused to incorporate Ms. Whitesel's accomplishments from her six-week assignment as the Ambassador's OMS, asserting these were outside her P/E Section duties. Ms. Cooley provided a pre-drafted reviewer statement and deleted positive language describing Ms. Whitesel as "collaborative" with her peers.

78. The opening paragraph of Ms. Cooley's published reviewer statement enumerated clerical task categories tracking what Ms. Cooley had drafted into Ms. Whitesel's Work Requirements Statement on November 15, 2021. The reviewer statement did not include the narrative evaluation of Ms. Whitesel's potential to assume positions of greater responsibility that DS-5055 instructions direct.

79. Ms. Cooley's final reviewer comment stated, "Jamie enjoys professional relations with her rater and peers," language that in Foreign Service EER lexicon constitutes a coded negative assessment.

17

80. On May 4, 2022, Ms. Whitesel replied that the Section Chief's (Ms. Cooley's) reviewer statement as written "will negatively impact me as it minimizes my relationship with the team and my peers," "omits substantive content relating to the core precepts," and "does not provide any impact statements."

81. On or about May 5, 2022, Ms. Whitesel sent an email to Deputy Chief of Mission Michaels and Ms. Brown stating, " I feel Janae is retaliating against me, which is exactly what I was afraid of after what happened last year…. I'm not the first person she's damaged via an EER." This email went unanswered.

82. On or about May 5, 2022, after Ms. Whitesel's protected communication and the inclusion of anti-harassment language in her employee statement, Ms. Cooley, without prior notice to Ms. Whitesel, amended her reviewer statement in the Department's evaluation system to add a single line: "and earned the appreciation of the entire team as well as the Front Office for her efforts." Ms. Cooley's prior drafts had categorically excluded Front Office work as outside Ms. Whitesel's Pol/Econ duties.

83. Ms. Connell served as chair of Ms. Whitesel's EER review panel. The Panel Chair is responsible for ensuring that the Employee Evaluation Report is thorough, objective, sound, and in compliance with evaluation instructions and published Department guidance. DS-5055 reviewer-statement instructions (for performance evaluations in the Foreign Service) for the 2022 performance cycle required the reviewer to "independently assess the rated employee's preparedness for assuming positions of greater responsibility, citing examples of performance…" and to "document the employee's record of working collaboratively with peers."

84. As Panel Chair, Ms. Connell permitted Ms. Whitesel's 2022 EER to be finalized to Ms. Whitesel's Official Personnel Folder (OPF) without a readiness-for-promotion assessment in the

18

reviewer statement, without performance examples, without acknowledgment of Plaintiff's peer collaboration, and without impact statements. Ms. Connell took affirmative action to remove Ms. Whitesel's reference to anti-harassment efforts in Ms. Whitesel's employee statement.

85. On or about September 1, 2022, Ms. Whitesel was constructively curtailed from her P/E OMS position and reassigned to the Regional Security Office OMS position. The Department characterized the transfer in its August 30, 2022 Assignment Notification – Personnel Action email as: "Tour of Duty for [Ms. Whitesel] has been curtailed by 22 months. Your new tour of duty is 14M2RR. Tour length is 14 months." The hostile and intolerable working conditions created by Ms. Cooley, Ms. Smith, Ms. Brown, and others made Ms. Whitesel's continued service in the P/E Section impossible. The constructive curtailment was an adverse personnel action that altered the terms and conditions of Ms. Whitesel's employment, including a 22-month reduction of her tour, a forced change in funding bureau from the Bureau of Near Eastern Affairs to the Bureau of Diplomatic Security, and the resulting career impact.

86. On or about September 2, 2022, Ms. Whitesel learned she was not promoted to FS-04. This was the only year during the relevant period in which Ms. Whitesel was not explicitly recommended for promotion by her rater and reviewer, and by the 2022 Foreign Service Selection Board (FSSB), despite being recommended for promotion by the FSSB in 2021, 2023, and ultimately promoted in 2024 when she ranked 3rd out of 94 FSSB recommended employees.

87. The 2022 Employee Evaluation Report has remained in Plaintiff's Official Personnel Folder (OPF) since its publication in May 2022. Department promotion practice provides that the Foreign Service Selection Board reviews and places greatest emphasis on the five most recent years of evaluative material in the OPF. The 2022 Foreign Service Selection Board, the 2023 Foreign Service Selection Board, and the 2024 Foreign Service Selection Board each reviewed the

past five years of evaluative material in Plaintiff's OPF. The 2022 Employee Evaluation Report appeared in each review window. Each Foreign Service Selection Board's reliance on the 2022 Employee Evaluation Report was a separate adverse personnel action affecting Plaintiff's career, not a continuing effect of the original drafting.

88. The Department failed to provide Ms. Whitesel with a performance evaluation for the five-month period from April 2022 through August 2022 during which she served in the P/E Section prior to her curtailment, despite Department policy requiring interim evaluations for service periods exceeding 120 days. Department regulations at 3 FAH-1 H-2814 require an interim Employee Evaluation Report for periods of performance of 120 days or more upon employee reassignment. Ms. Smith and Ms. Cooley, who likewise transferred from their positions during the same period, each received Employee Evaluation Reports covering the same period of performance. Ms. Whitesel did not.

89. Ms. Smith also forced the conversion of Ms. Whitesel's approved sick leave (when Ms. Whitesel was out due to medical necessity) to annual leave based on information and belief, in relation to Ms. Whitesel's attendance at the after-hours Marine Corps Ball social event on November 19, 2021 (which did not impact Ms. Whitesel's sick leave and was in line with her doctor's guidance to not self-isolate).

90. Following her initiation of an EEO complaint on October 11, 2022 (which followed her opposition to discrimination in 2021-2022), Ms. Whitesel continued to experience retaliation and discrimination. In or about January 2023, Management Officer Marissa M. Gurfield told Ms. Whitesel during a meeting that she was being "challenging" and made remarks referencing a prior official's preference for "pretty young women," and implying this male colleague was responsive to Ms. Whitesel only because she was a "pretty young thing" in Ms. Gurfield's words. In addition,

20

Ms. Gurfield commented that she wanted to ban heels on the compound while making references to "slut" and "whore."

91. On May 11, 2023, Deputy Chief of Mission Michaels denied Ms. Whitesel's request for a one-year tour extension, citing concerns about burnout risk after four years at post and stating that the new Front Office should have input. Upon information and belief, other employees in similar circumstances received tour extensions.

92. In May 2023, during the EER drafting process, Panel Chair Pamela E. Ganz added negative comments to Ms. Whitesel's EER referencing her use of the Department's dissent channel (which was done at Ms. Brown's direction). On June 1, 2023, Director of Performance Evaluation Lisa Vickers reviewed the matter and concluded the comments were admissible and that the panel chair's notation was procedurally improper because the rater had spoken favorably about Ms. Whitesel's use of the dissent channel. Ms. Vickers directed that the panel chair's negative additions be removed from Ms. Whitesel's EER, and Ms. Vickers further commended Ms. Whitesel for the very accomplishments described in the Employee Evaluation Report that the notation had been used to criticize.

93. On May 26, 2023, Deputy Chief of Mission Michaels nominated another employee, Hermilla Yifter, for an award for coordinating the 2022 Independence Day official celebration. Ms. Whitesel, who served as deputy coordinator, was excluded from the nomination and received no recognition for her substantial work on the event. The Embassy's Joint Country Awards Committee, established under Embassy Management Policy No. 02/19, requires Human Resources to route all award nominations to the Joint Country Awards Committee (JCAC) for the JCAC's decision. Ms. Brown, as Human Resources Officer, did not transmit a separate group award nomination submitted by Delvis Jimenez on May 10, 2023, that included both Ms. Yifter and Ms.

Whitesel. Ms. Brown's successor, Marcia Outlaw, subsequently forwarded the same group nomination — for the same event — to the JCAC for the 2024 spring cycle on April 5, 2024. The JCAC approved the nomination and Ms. Whitesel received the group award. The Department has not uploaded the award to Ms. Whitesel's OPF.

94. In 2024, although Ms. Whitesel ultimately received a paper certificate for an Independence Day award and another award, neither award was entered into her electronic OPF (eOPF), continuing to harm her career prospects and professional reputation.

95. As a result of the Department's discriminatory conduct, Ms. Whitesel has suffered and continues to suffer substantial harm, including emotional distress, damage to her career and professional reputation, loss of career advancement opportunities, and financial losses from the denied promotion and other adverse employment actions.

## CAUSES OF ACTION

### COUNT I

### DISCRIMINATION BASED ON SEX IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e, ET SEQ. (SEX-BASED DISPARATE TREATMENT)

96. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

97. Ms. Whitesel was, at all times relevant herein, an employee of Defendant within the meaning of Title VII, 42 U.S.C. § 2000e *et seq*.

98. At all times relevant herein, Defendant was Ms. Whitesel's employer within the meaning of Title VII, 42 U.S.C. § 2000e *et seq*.

99. Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a) and § 2000e-16(a), prohibits employment practices that discriminate against employees on the basis of sex.

22

100.    Ms. Whitesel is a member of a protected class based on her sex (female).

101.    Ms. Whitesel was qualified for her position as Office Management Specialist at the U.S. Department of State.

102.    Ms. Whitesel was unlawfully and intentionally subjected to disparate treatment and adverse employment actions because of her sex, including the manipulation of her 2022 performance evaluation to include coded-negative language, denial of a promotion recommendation for the 2022 promotion cycle, omitting substantive contributions, constructive curtailment from her P/E OMS assignment, denial of tour extension, exclusion from awards and professional recognition, and assignment of gendered domestic-service tasks and behaviors not required of male personnel, as well as Ms. Cooley's institutionalization of personal-secretary-to-supervisor obligations through Ms. Whitesel's Position Description requiring "primary support to the Political Economic Counselor" and through three of the four Specific Objectives in Ms. Whitesel's Work Requirements Statement defined by reference to the Counselor personally; Ms. Cooley's unauthorized drafting of Ms. Whitesel's Work Requirements Statement notwithstanding her status as reviewing officer rather than rater; Ms. Cooley's attempt to take over as Ms. Whitesel's direct supervisor to have complete control over her; Ms. Cooley, Ms. Smith, and Ms. Brown building work requirements to function as a PIP against a fabricated performance issues document in order to effect a personnel action; the November 9, 2021 HRO Planning Email designing the EER-based adverse-action regime; the November 19, 2021 "Performance and Conduct examples" list operationalizing sex-targeted documentation; the January 4, 2022 imposition of the pseudo PIP; the April 19, 2022 rejection of Ms. Whitesel's reviewer-statement bullets; Ms. Smith's April 20, 2022 communication that she would not recommend Ms. Whitesel for promotion because of "interpersonal challenges" with Ms. Cooley while "the others are able to

manage their relationship with her;" the April 29, 2022 deletion of "collaborative" from Ms. Whitesel's reviewer-statement language; the May 5, 2022 absent promotion recommendation in the published 2022 EER; the revision of the area for development from "exceptionally collaborative" to "essential support;" Ms. Cooley's post-complaint amendment; the published 2022 EER's coded-negative "professional relations" reviewing-officer language; the appointment of Ms. Connell, who had physically threatened Ms. Whitesel, and who was the supervisor of Ms. Brown, as Panel Chair for Ms. Whitesel's 2022 Employee Evaluation Report; Ms. Connell and Ms. Brown permitting Ms. Whitesel's 2022 Employee Evaluation Report to be finalized to Ms. Whitesel's OPF without an assessment of Ms. Whitesel's potential to serve at the next grade in the reviewer statement, without performance examples aligned with the mid-level core precepts or impact statement, and without acknowledgment of Ms. Whitesel's peer collaboration; the failure to issue the required interim EER for the April 16 – August 31, 2022 period; Ms. Brown's incorrect August 11, 2022 interim-EER guidance and Front-Office-suppression warning; the September 1, 2022 constructive curtailment from the Pol/Econ Section to the RSO; the September 1, 2022 non-promotion to FS-04; the 2023 non-promotion despite being recommended by the FSSB; the May 11, 2023 tour-extension denial after imposition of a written-justification requirement contrary to 23 STATE 30172; the May 15, 2023 EER manipulation by Ms. Ganz under Ms. Brown's encouragement; Ms. Whitesel's substantive contributions and regulatory analyses repeatedly dismissed and subsequently confirmed correct by the institutional record, only after she had been forced to fight at length to be heard; Management did not enter the 2024 Meritorious Group Award certificate into Plaintiff's OPF or give her the associated monetary award.

103. The adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Ms. Whitesel's sex, including management's application of

sex stereotypes regarding appropriate behavior and tasks for female employees, and where similar control over performance and conduct was weaponized against her other female subordinates, including weaponizing the EER process by including damaging references to interpersonal issues with Ms. Cooley,  where male employees were treated more favorably and were not subjected to these actions, including Mr. Neil Gundavda who testified that he stopped writing – a core function of his job - and became less productive but never experienced the same negative feedback, humiliation, career consequences, or counseling from Ms. Cooley.

104.    Defendant's stated reasons for the adverse employment actions, including alleged performance deficiencies and interpersonal issues, were pretextual, as evidenced by the admitted fabrication of the November 19, 2021 performance list, the timing of adverse actions following protected activity, and the Anti-Harassment Program's (AHP) finding that sex-based harassment occurred.

105.    Defendant's unlawful actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from discrimination based on sex.

106.    As a direct, legal, and proximate result of the sex-based discrimination, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion and diminished earning capacity; non-economic damages, including severe emotional distress, anxiety, depression, reputational harm, and humiliation; and damage to her career, professional reputation, and career advancement, resulting in damages in an amount to be proven at trial.

**COUNT II**

**DISCRIMINATION BASED ON SEX IN VIOLATION OF TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e, ET SEQ.
(SEX-BASED HOSTILE-WORK-ENVIRONMENT HARASSMENT)**

107.    Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

108.    Ms. Whitesel was subjected to unwelcome harassment by Defendant's agents and employees, including Ms. Cooley, Ms. Smith, Ms. Brown, Ms. Connell, and Ms. Gurfield, because of her sex (female).

109.    The discriminatory conduct included spreading false sexualized rumors about Ms. Whitesel's personal life and implying sexual promiscuity, assigning gendered domestic-service tasks such as dog-walking and personal errands not required of male employees, publicly humiliating and criticizing Ms. Whitesel, physically confronting and intimidating Ms. Whitesel, excluding Ms. Whitesel from professional opportunities and communications, and ostracizing Ms. Whitesel both socially and professionally.

110.    Through the aforementioned acts, the Department subjected Ms. Whitesel to unwelcome harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive and hostile work environment.

111.    The harassment was because of Ms. Whitesel's sex and included facially sex-based conduct such as sexualized rumors and sex-stereotyped task assignments based on gender roles (dog walking, demeaning daily cleaning, residence tasks, and husband-related personal scheduling) not similarly required of male personnel, verbal harassment such as yelling, a workstation confrontation that physically blocked Ms. Whitesel's egress, sustained ostracization beginning at the November 19, 2021 Marine Corps Ball and continuing through July 2022 across

26

team activities and a communications group removal, characterizing Ms. Whitesel progressively as "exceptionally collaborative," "essential support," the successor Management Counselor, Ms. Gurfield's January 2023 sex-stereotyped framings ("difficult to work with," "perception that you go over everyone's head," and "pretty young thing"), the imposition of a workplace "etiquette" directive restricting Plaintiff's personal exchanges with other employees during work hours, built on the Section Chief's sexualized "line of men" at [Plaintiff's] desk, all in the closed-compound Embassy Beirut environment in which Plaintiff was required to live and work on the same secured premises as the Section Chief, and culminating in the Anti-Harassment Program's institutional finding that the Section Chief was "harsher to women than men" and "seemingly target[ed subordinates] because of their sex.. The harassment also included the discriminatory events described in paragraph 102.

112.    A reasonable person in Ms. Whitesel's position would find the work environment to be hostile and abusive as a result of Defendant's agents' and employees' conduct, and Ms. Whitesel subjectively perceived the environment as hostile and abusive.

113.    Management-level employees, including Ms. Smith, Ms. Brown, Ms. Connell, and Deputy Chief Michaels, knew or should have known of the harassment because such employees were themselves witnessed the harassment without intervening, and received multiple complaints from Ms. Whitesel and others regarding harassment by Ms. Cooley. Defendant failed to take prompt and adequate corrective action and instead substituted informal monitoring for a required formal investigation.

114.    Defendant's unlawful actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from discrimination based on sex.

27

115. As a direct, legal, and proximate result of the sex-based hostile work environment harassment, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion and diminished earning capacity; non-economic damages, including severe emotional distress, anxiety, depression, reputational harm, and humiliation; and damage to her career, professional reputation, and career advancement, resulting in damages in an amount to be proven at trial.

**COUNT III**

**DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED, 29 U.S.C. § 701, ET. SEQ. (DISABILITY-BASED DISPARATE TREATMENT)**

116. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

117. The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 and § 794(a), prohibits federal agencies from discriminating against qualified individuals with disabilities. Section 794a(a)(1) incorporates the standards applicable to claims of discrimination in employment under the Americans with Disabilities Act.

118. Ms. Whitesel has a mental impairment, specifically Adjustment Disorder with Depression and Anxiety, for which she was diagnosed in approximately 2005. This mental impairment substantially limits one or more major life activities within the meaning of 42 U.S.C. § 12102(3).

119. Alternatively, Defendant regarded Ms. Whitesel as having a mental impairment within the meaning of 42 U.S.C. § 12102(3)(A) based on Defendant's treatment of Ms. Whitesel after she disclosed her mental health treatment, medication, and medical leave needs.

28

120. At all times relevant herein, Ms. Whitesel was qualified to perform the essential functions of her Office Management Specialist position, with or without reasonable accommodation.

121. Ms. Whitesel disclosed her mental health condition and/or treatment to her supervisors and the Department's medical provider and psychiatrist on multiple occasions, including September 23, 2021, November 8, 2021, November 9, 2021, November 16, 2021, November 18, 2021, November 23, 2021, November 29, 2021, December 2, 2021, and January 4 and 11, 2022.

122. Ms. Whitesel was subjected to adverse employment actions because of her actual or perceived disability, including the fabrication of performance documentation created immediately after her medical leave requests, forced conversion of sick leave to annual leave, use of her therapy and medical information to shame and discredit her, the imposition of a workplace directive restricting her medical-related phone calls — built on a therapist-call allegation the Section Chief admitted under oath was made without knowledge, the imposition of after-hours email-and-phone-monitoring requirements that tethered her to her supervisor's reach in a closed-compound environment and eliminated her personal-time respite, the institutional weaponization of her medical leave through Ms. Cooley, Ms. Brown, and Ms. Smith's false representations to EEO investigators that Plaintiff had been on "weeks of sick leave" when the leave record showed otherwise, the cancellation of substantive professional work Plaintiff had performed because her supervisor would not use it, the denial of a promotion recommendation in her 2022 Employee Evaluation Report, the failure to engage the interactive process when the Department was on notice of her mental-health condition, manipulation of her 2022 performance evaluation, constructive

29

curtailment from her P/E OMS position, denial of tour extension, and all of the discriminatory conduct noted in paragraph 102.

123.    The temporal proximity between Ms. Whitesel's disability disclosures and the adverse actions establishes causation. On November 8, 2021, Ms. Whitesel disclosed burnout and requested medical leave. On November 9, 2021, one day later, Ms. Brown authored the planning email outlining adverse documentation against Ms. Whitesel. On November 16, 2021, Ms. Whitesel requested an extension of medical leave after consulting with the Department medical provider on-site. On November 17, 2021, one day later, Ms. Cooley intensified adverse actions commenting to Ms. Whitesel's colleague Ms. Langer that she needed to be ready to perform Ms. Whitesel's duties because Ms. Whitesel was taking so much leave. On November 19, 2021, the same day Ms. Whitesel, Ms. Cooley produced the fabricated performance list and publicly humiliated Ms. Whitesel at the Marine Corps Ball. On November 30, 2021, Ms. Whitesel submitted Department psychiatrist Dr. Welsby's note to Ms. Smith who forwarded it to Ms. Brown. Within five to six days, on December 5-6, 2021, Ms. Cooley subjected Ms. Whitesel to public criticism in a social setting, and on December 7, 2021, after Ms. Whitesel confronted Ms. Cooley about her public criticism, Ms. Cooley became aggressive and screamed at Ms. Whitesel during a meeting with Ms. Whitesel was still on medical leave.

124.    Ms. Cooley fabricated an allegation that Ms. Whitesel "conducted a counseling session with her therapist on her work phone at her workstation during work hours" and incorporated this allegation into the November 19, 2021 performance list. Ms. Cooley admitted under oath that she "did not know whether [Ms. Whitesel] was on the phone with her therapist."

125.    Defendant used Ms. Whitesel's medical and therapy information to shame and discredit her including incorporating references to therapy into performance documentation,

30

publicly criticizing Ms. Whitesel for attending an after-hours social event while on medical leave, circulating rumors about Ms. Whitesel's mental fitness, and forcing conversion of approved sick leave to annual leave.

126. Defendant failed to engage in the interactive accommodation process with Ms. Whitesel after learning of her disability and her need for medical leave and accommodation.

127. Similarly situated employees without disabilities were treated more favorably than Ms. Whitesel. Upon information and belief, employees without disabilities were not subjected to fabricated performance documentation, forced leave conversions, or adverse actions based on medical leave requests.

128. Defendant's stated reasons for the adverse employment actions, including alleged performance deficiencies and interpersonal issues, were pretextual. The true motive for the adverse actions was disability-based animus, as evidenced by the temporal proximity between disability disclosures and adverse actions, the fabricated therapist allegation, and the use of medical information to shame Ms. Whitesel.

129. Defendant's unlawful actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from discrimination based on disability.

130. As a direct, legal, and proximate result of Defendant's disability discrimination, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost promotion opportunity, and medical treatment costs for the exacerbation of her mental health condition; non-economic damages, including severe emotional distress, exacerbation of her Adjustment Disorder with Depression and Anxiety requiring increased medication dosage, humiliation, and damage to her reputation and career, resulting in damages in an amount to be proven at trial.

**COUNT IV**

**DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED, 29 U.S.C. § 701, ET. SEQ. (DISABILITY-BASED HOSTILE-WORK-ENVIRONMENT HARASSMENT)**

131.   Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

132.   The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794(a) and § 794a(a)(1), prohibits federal agencies from subjecting qualified individuals with disabilities to hostile work environment harassment. Section 794a(a)(1) incorporates the standards applicable to disability-based hostile work environment claims under 42 U.S.C. § 12112.

133.   Ms. Whitesel has a mental impairment, specifically Adjustment Disorder with Depression and Anxiety, within the meaning of the Rehabilitation Act and ADA. Alternatively, Defendant regarded Ms. Whitesel as having a mental impairment within the meaning of 42 U.S.C. § 12102(3)(A).

134. Ms. Whitesel was subjected to unwelcome harassment by Defendant's agents and employees, including Ms. Cooley, Ms. Smith, Ms. Brown, Ms. Connell, and Ms. Gurfield, based on her actual or perceived mental health condition.

135. The disability-based harassment included fabricating allegations that Ms. Whitesel conducted therapy sessions during work time, using Ms. Whitesel's medical and therapy information to shame and discredit her, circulating rumors about Ms. Whitesel's mental fitness and suggesting she was mentally unstable, publicly criticizing Ms. Whitesel for attending an after-hours social event while on medically-approved sick leave, forcing conversion of approved sick leave to annual leave based on this attendance, and creating false performance documentation that falsely attributed alleged errors to Ms. Whitesel's mental health condition, the January 4, 2022

32

pseudo PIP package incorporating the medical-related-calls directive as a binding workplace rule, the January 4, 2022 Deputy Section Chief's treatment of the fabricated therapist allegation as established fact while administering the pseudo PIP, the January 4, 2022 HRO "rude awakening" email expressing animus toward Plaintiff for "feeling sorry for herself" while Plaintiff was in active mental-health treatment, the November 8, 2021 chancery yelling event immediately following Plaintiff's written burnout disclosure, the November 19, 2021 list sent the day after Plaintiff submitted the formal leave form, the Marine Corps Ball ostracization weaponizing Plaintiff's documented medical leave, the December 7, 2021 tirade meeting Plaintiff was required to attend on her day off after submitting her psychiatrist's note, the after-hours email-and-phone-monitoring requirement that eliminated personal-time respite for an employee with disclosed mental-health condition in the closed-compound environment where Plaintiff was required to live and work on the same secured premises, the medical-disclosure-to-retaliation intensification pattern (Plaintiff's November 8, 2021 burnout email followed within hours by chancery yelling and within one day by the Planning Email; the November 16 sick-leave request followed within one day by the Section Chief's punitive remark to Ms. Langer and within three days of the November 19, 2021 list; the November 18, 2021 leave-form submission followed the next day by the November 19, 2021 list; the November 29, 2021 psychiatrist's note followed within five to six days by the December 5 public criticism and December 7, 2021 tirade; the December 2, 2021 "Issues Summary" email followed within five days by the tirade meeting), the May 11, 2023 tour-extension denial framed in terms of Plaintiff's documented "burnout," and all of the discriminatory conduct noted in paragraphs 102 and 122.

136. Through the aforementioned acts, Defendant subjected Ms. Whitesel to unwelcome harassment that was sufficiently severe or pervasive to alter the conditions of her employment and

create an abusive and hostile work environment. The harassment was pervasive, occurred repeatedly over multiple months, created a humiliating and hostile atmosphere where Ms. Whitesel both lived and worked without freedom of movement, in an enclosed compound protected by dozens of armed guards 24/7, and was motivated by animus toward Ms. Whitesel's mental health condition.

137. The harassment was because of Ms. Whitesel's actual or perceived mental health disability, as evidenced by the disability-specific nature of the conduct, including the fabricated therapist allegation, the use of medical leave as a basis for criticism and adverse action, and the circulation of disability-related rumors.

138. Management-level employees, including Ms. Smith, Ms. Brown, and Deputy Chief Michaels, knew or should have known of the disability-based harassment because such employees witnessed the harassment without intervening, and received multiple complaints from Ms. Whitesel. Defendant failed to take prompt and adequate corrective action to remedy the disability-based harassment.

139. Defendant's unlawful actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from discrimination based on disability.

140. As a direct, legal, and proximate result of Defendant's disability-based hostile work environment harassment, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost promotion opportunity, and medical treatment costs for the exacerbation of her mental health condition necessitating increased medication and additional psychiatric care; non-economic damages, including severe emotional distress, exacerbation of her Adjustment Disorder with Depression and Anxiety, humiliation, and damage to her reputation and career.

**COUNT V**

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e, ET. SEQ. (REPRISAL-BASED DISPARATE TREATMENT UNDER TITLE VII)**

141. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

142. Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) and § 2000e-16(a), prohibits retaliation against employees who oppose discriminatory practices or participate in protected EEO activity.

143. Ms. Whitesel engaged in protected activity under Title VII by opposing discriminatory practices and participating in the EEO complaint process. Ms. Whitesel's protected activities included: (1) reporting harassment and discriminatory treatment to Ms. Smith, Ms. Brown, and Deputy Chief Michaels on multiple occasions from November 2021 through May 2022, including written reports on December 2, 2021 and May 5, 2022; (2) contacting an EEO Counselor on October 11, 2022; (3) reporting harassment to the Office of Inspector General on October 31, 2022; (4) filing a formal EEO complaint on January 23, 2023; (5) reporting danger-pay misapplication to management and AFSA in or about November 2022 through January 2023; (6) using the Department's dissent channel in or about March 2023 to oppose discriminatory practices and (7) objectively opposing discriminatory harassment by including in her employee statement of her 2022 regular performance evaluation that she objected to gender based harassment and championed the Departments anti-harassment efforts through formal channels.

144. Following Ms. Whitesel's protected activities, Defendant subjected Ms. Whitesel to materially adverse actions that would dissuade a reasonable employee from engaging in protected activity. These materially adverse actions included: (1) creation of fabricated performance

35

documentation on November 19, 2021, one day after Ms. Whitesel requested medical leave and eleven days after reporting harassment; (2) manipulation of Ms. Whitesel's 2022 Employee Evaluation Report to include coded-negative language and exclude significant accomplishments; (3) denial of promotion recommendation for the 2022 promotion cycle on April 20, 2022; (4) forced conversion of approved sick leave to annual leave; (5) constructive curtailment from her P/E OMS position on September 1, 2022; (6) not providing a mandatory EER for the period between April 15, 2022 through August 30, 2022; (7) removal of Front Office OMS coverage responsibilities beginning January 2023; (8) denial of tour extension on May 11, 2023; (9) tampering with her 2023 EER to add negative comments referencing her dissent channel use on May 15, 2023; (10) downgrading and manipulation of award nominations on May 16, 2023; (11) exclusion from the DCM Mr. Michaels' 2022 Independence Day award nomination despite her substantial work as deputy coordinator; and (12) failure to enter her 2024 awards in her electronic Official Personnel File, continuing to harm her career prospects.

145. There is a strong causal connection between Ms. Whitesel's protected activities and the materially adverse actions taken against her, as demonstrated by temporal proximity. On November 8, 2021, Ms. Whitesel disclosed burnout and requested medical leave. On November 9, 2021, one day later, Ms. Brown authored an email outlining a plan to build adverse documentation against Ms. Whitesel. Ms. Whitesel objected to discriminatory practices on October 27, 2021 and reported harassment throughout November and December 2021. On November 19, 2021, Ms. Cooley produced a fabricated performance list. Ms. Whitesel sent a written report of retaliation to Deputy Chief of Mission Michaels and Ms. Brown on May 5, 2022, which went unanswered, and adverse EER actions followed. Ms. Whitesel contacted an EEO

Counselor in October 2022 and filed a formal complaint in January 2023, and continuing adverse actions occurred throughout 2023 and 2024.

146. Ms. Whitesel's protected activity was the but-for cause of the adverse actions taken against her. The timing of the adverse actions immediately following protected activity, combined with the admitted fabrication of performance documentation, demonstrates that Defendant would not have taken these actions but for Ms. Whitesel's protected activity.

147. Defendant's proffered reasons for the adverse actions, including alleged performance deficiencies and interpersonal issues, were pretextual. The pretext is evidenced by *inter alia*: (1) Ms. Cooley's admission under oath that the November 19, 2021 performance list was "not factual"; (2) Ms. Brown's November 9, 2021 planning email documenting the creation of adverse documentation before the conduct it purported to document; (3) the temporal proximity between protected activity and adverse actions; (4) Director Vickers' reversal of the EER tampering as improper; and (5) the AHP finding that Ms. Cooley committed sex-based harassment, confirming the unlawful nature of the underlying conduct Ms. Whitesel opposed.

148. Defendant's unlawful retaliatory actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from retaliation for engaging in protected activity under Title VII.

149. As a direct, legal, and proximate result of Defendant's retaliation, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost career advancement opportunities, and diminished earning capacity; non-economic damages, including severe emotional distress, anxiety, depression, humiliation, and damage to her career and reputation; and constructive discharge from her P/E OMS position due

to intolerable working conditions created by Defendant's retaliatory conduct, resulting in damages in an amount to be proven at trial.

**COUNT VI**

**<u>RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e, ET. SEQ. (REPRISAL-BASED HOSTILE-WORK-ENVIRONMENT HARASSMENT UNDER TITLE VII)</u>**

150. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

151. Ms. Whitesel engaged in protected activity under Title VII, as detailed in the preceding paragraphs, by opposing discriminatory practices, reporting harassment to management, participating in EEO counseling, filing a formal EEO complaint, reporting to the Office of Inspector General, and using the Department's dissent channel.

152. Following Ms. Whitesel's protected activities, Defendant subjected Ms. Whitesel to unwelcome retaliatory harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive and hostile work environment. The retaliatory harassment included: (1) intensified harassment immediately following Ms. Whitesel's complaints, including the fabrication of performance issues on November 19, 2021, one day after she requested medical leave and eleven days after reporting harassment; (2) public humiliation at the Marine Corps Ball on November 19, 2021, including clearing the dance floor when Ms. Whitesel entered; (3) systematic ostracization and the "silent treatment" beginning in November 2021; (4) exclusion from the P/E Section WhatsApp group on July 12, 2022, cutting off critical work communications in a high-threat environment; (5) creation of a pseudo Performance Improvement Plan on January 4, 2022, built line-for-line on the fabricated November 19, 2021 list; (6) threatening statements, including Ms. Cooley's statement on December 7, 2021 that "There is a Post for everyone, but not

38

everyone is for every Post"; (7) Ms. Connell's intimidating inquiry on or about March 23, 2023, asking Ms. Whitesel whether she had filed an EEO complaint and stating "In my position I would know and I have not received any notifications of any complaints"; (8) Management Officer Gurfield's derogatory comments in January 2023 referencing Ms. Whitesel as a "pretty young thing" and making remarks about a prior official's preference for "pretty young women"; remarks including "slut" and "whore" and (9) systematic blocking of professional opportunities, including exclusion from award nominations, removal of Front Office responsibilities, and interference with onward assignment opportunities.

153. The retaliatory harassment was because of Ms. Whitesel's protected activity. The harassment was a direct response to Ms. Whitesel's complaints about discrimination and her participation in EEO processes, as evidenced by the immediate escalation of hostile conduct following each protected activity and the explicit references to her complaints in management communications.

154. The retaliatory harassment was pervasive, occurring repeatedly from November 2021 through at least 2024, and created both an objectively and subjectively intolerable work environment. A reasonable person in Ms. Whitesel's position would have found the work environment hostile and abusive as a result of the retaliatory harassment, and Ms. Whitesel subjectively perceived the environment as hostile and abusive. Ms. Whitesel could not escape, she lived, worked, ate, exercised inside a closed compound with these people.

155. Management-level employees, including Ms. Smith, Ms. Brown, Ms. Cooley, Ms. Connell, Ms. Gurfield, and Deputy Chief Michaels, knew or should have known of the retaliatory harassment because such employees were themselves the retaliators, witnessed the retaliation without intervening, and received multiple reports from Ms. Whitesel regarding the retaliatory

conduct. Defendant failed to take prompt and adequate corrective action to remedy the retaliatory harassment.

156.  Defendant's unlawful retaliatory actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from retaliation for engaging in protected activity under Title VII.

157. As a direct, legal, and proximate result of Defendant's retaliatory hostile work environment harassment, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost career advancement opportunities, and diminished earning capacity; non-economic damages, including severe emotional distress, anxiety, depression, humiliation, and damage to her career and reputation; and constructive curtailment from her P/E OMS position due to intolerable working conditions created by Defendant's retaliatory conduct, resulting in damages in an amount to be proven at trial.

## COUNT VII

## RETALIATION IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED, 29 U.S.C. § 701, ET SEQ.
## (REPRISAL-BASED DISPARATE TREATMENT UNDER THE REHAB. ACT)

158. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

159. The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 and § 794a(a)(1), prohibits retaliation against employees who engage in protected activity under the Rehabilitation Act or the Americans with Disabilities Act. Section 794a(a)(1) incorporates the anti-retaliation provisions of 42 U.S.C. § 12203.

160. Ms. Whitesel engaged in protected activity under the Rehabilitation Act and ADA by: (1) requesting medical leave for her mental health condition on November 8, 2021; (2)

40

requesting an extension of medical leave after consulting with a psychiatrist on November 16, 2021; (3) submitting Dr. Welsby's psychiatric note to Ms. Smith, who forwarded it to Ms. Brown on November 29-30, 2021; (4) disclosing her mental health symptoms and need for accommodation in her December 2, 2021 email to Ms. Smith; (5) continuing to receive mental health treatment throughout her employment; (6) reporting disability-based harassment to management; and (7) filing an EEO complaint on January 23, 2023 that alleged disability discrimination.

161. Following Ms. Whitesel's disability-related protected activities, Defendant subjected Ms. Whitesel to materially adverse actions, including: (1) creating fabricated performance documentation on November 19, 2021, one day after Ms. Whitesel requested medical leave; (2) fabricating an allegation that Ms. Whitesel conducted therapy sessions during work time and incorporating this into performance documentation; (3) forcing conversion of Ms. Whitesel's approved sick leave to annual leave based on her attendance at an after-hours social event while on medical leave; (4) using Ms. Whitesel's medical and therapy information against her in performance evaluations and management communications; (5) denying Ms. Whitesel a promotion recommendation for the 2022 promotion cycle; (6) manipulating Ms. Whitesel's 2022 Employee Evaluation Report to include coded-negative language; (7) constructively curtailing Ms. Whitesel from her P/E OMS position on September 1, 2022; (8) denying Ms. Whitesel's tour extension request on May 11, 2023; and (9) creating intolerable working conditions that forced Ms. Whitesel's departure from her position.

162. There is a strong causal connection between Ms. Whitesel's disability-related protected activity and the materially adverse actions taken against her. The temporal proximity is dispositive: on November 8, 2021, Ms. Whitesel requested medical leave; on November 9, 2021,

one day later, Ms. Brown authored the planning email outlining adverse documentation. On November 16, 2021, Ms. Whitesel requested a medical leave extension; on November 17, 2021, one day later, Ms. Cooley intensified adverse actions. On November 19, 2021, the same day Ms. Whitesel began medical leave, Ms. Cooley produced the fabricated performance list and publicly humiliated Ms. Whitesel. On November 30, 2021, Ms. Whitesel submitted Dr. Welsby's note; within five to six days, on December 5-6, 2021, Ms. Cooley subjected Ms. Whitesel to public criticism and an aggressive meeting while she was on medical leave.

163. Ms. Whitesel's disability-related protected activity was the but-for cause of the adverse actions taken against her. Defendant's stated reasons for the adverse actions, including alleged performance deficiencies, were pretextual. The true motive was retaliation for Ms. Whitesel's exercise of her rights under the Rehabilitation Act, as evidenced by the immediate timing of adverse actions following each disability disclosure, the fabricated therapist allegation that Ms. Cooley admitted she made without knowledge, and the use of medical information as the basis for adverse performance documentation.

164. Defendant's unlawful retaliatory actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from retaliation for engaging in protected activity under the Rehabilitation Act.

165. As a direct, legal, and proximate result of Defendant's retaliation under the Rehabilitation Act, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost career advancement opportunities, and medical treatment costs for the exacerbation of her mental health condition; non-economic damages, including severe emotional distress, exacerbation of her Adjustment Disorder with Depression and Anxiety requiring increased psychiatric treatment and medication dosage,

42

humiliation, reputational harm, and damage to her professional career; and constructive discharge from her P/E OMS position due to intolerable working conditions created by Defendant's retaliatory conduct, resulting in damages in an amount to be proven at trial.

**COUNT VIII**

**RETALIATION IN VIOLATION OF THE REHABILITATION ACT OF 1973, AS AMENDED, 29 U.S.C. § 701, ET SEQ. (REPRISAL-BASED HOSTILE-WORK-ENVIRONMENT HARASSMENT UNDER THE REHAB. ACT)**

166. Ms. Whitesel repeats and realleges the allegations contained in the preceding paragraphs as though the same were set forth in full herein.

167. Ms. Whitesel engaged in protected activity under the Rehabilitation Act and ADA, as detailed in the preceding paragraphs, by requesting medical leave and accommodations for her mental health condition, disclosing her disability to supervisors, reporting disability-based harassment, and filing an EEO complaint alleging disability discrimination.

168. Following Ms. Whitesel's disability-related protected activities, Defendant subjected Ms. Whitesel to unwelcome retaliatory harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive and hostile work environment. The retaliatory harassment included: (1) harassment that intensified immediately after Ms. Whitesel's medical leave requests and disability disclosures; (2) fabricating and circulating an allegation that Ms. Whitesel conducted therapy sessions during work time, which Ms. Cooley admitted in her 2025 deposition she made without knowledge; (3) publicly shaming Ms. Whitesel for taking medically-approved sick leave and attending an after-hours embassy social event while on such leave; (4) circulating false rumors about Ms. Whitesel's mental fitness and suggesting she was mentally unstable; (5) using Ms. Whitesel's medical and therapy information to create a hostile and humiliating work environment, including incorporating therapy references into fabricated

43

performance documentation; (6) requiring Ms. Whitesel to come into the office during medical leave on December 6, 2021 and berating her for approximately one hour; and (7) intimidating Ms. Whitesel to discourage her from making further accommodation requests or disability-related complaints.

169.   The retaliatory harassment was because of Ms. Whitesel's disability-related protected activity. The harassment was pervasive, occurred repeatedly from November 2021 through 2024, and was directly responsive to Ms. Whitesel's assertion of her rights under the Rehabilitation Act. The conduct was severe, created a humiliating and hostile atmosphere, and would dissuade a reasonable employee from engaging in disability-related protected activity.

170.   Management-level employees, including Ms. Smith, Ms. Brown, Ms. Cooley, and Deputy Chief Michaels, knew or should have known of the retaliatory harassment because such employees were themselves the retaliators, witnessed the retaliation without intervening, and received multiple reports from Ms. Whitesel regarding the disability-based retaliatory conduct. Defendant failed to take prompt and adequate corrective action to remedy the retaliatory harassment.

171.   Defendant's unlawful retaliatory actions were intentional, willful, malicious, and done with reckless disregard to Ms. Whitesel's right to be free from retaliation for engaging in protected activity under the Rehabilitation Act.

172.   As a direct, legal, and proximate result of Defendant's retaliatory hostile work environment harassment under the Rehabilitation Act, Ms. Whitesel has sustained and will continue to sustain economic damages, including lost wages from the denied promotion, lost career advancement opportunities, and medical treatment costs for the exacerbation of her mental health condition; non-economic damages, including severe emotional distress, exacerbation of her

Adjustment Disorder with Depression and Anxiety requiring increased psychiatric treatment and medication dosage, humiliation, reputational harm, and damage to her career; and constructive discharge from her P/E OMS position due to intolerable working conditions created by Defendant's retaliatory conduct, resulting in damages in an amount to be proven at trial.

**RELIEF REQUESTED**

173.    WHEREFORE, Plaintiff Jamie R. Whitesel respectfully requests this Court grant the following relief:

A.  Declaratory judgment that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq*., through sex-based discrimination, disability-based discrimination, sex-based hostile work environment harassment, disability-based hostile work environment harassment, and retaliation;

B.  Injunctive and equitable relief, including retroactive promotion to FS-04 effective 2022 (the 2022 promotion cycle), correction of personnel records including modification or removal of negative performance evaluations and documentation, restoration of awards and professional recognition wrongfully denied or omitted from official records, and implementation of anti-discrimination and anti-retaliation training programs;

C.  Back pay and front pay, including lost wages and overtime pay, benefits, and other compensation from the date of adverse actions through trial and beyond;

D.  Compensatory damages for emotional distress, mental anguish, humiliation, damage to career and reputation, and other non-economic injuries, up to the maximum allowed under 42 U.S.C. § 1981a;

E.   Pecuniary damages and compensation for out-of-pocket expenses, including medical treatment costs and other expenses incurred as a result of Defendant's discrimination and retaliation;

F.   Pre-judgment and post-judgment interest on all monetary awards;

G.   Reasonable attorney's fees, expert witness fees, litigation costs, and expenses pursuant to 42 U.S.C. § 2000e-5(k) and 29 U.S.C. § 794a(b); and

H.   Such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

174.    Plaintiff hereby demands a trial by jury on all issues that are triable by jury.

Dated: May 10, 2026

Respectfully submitted,

/s/ Daniel K. Gebhardt
Daniel K. Gebhardt
(D.C. Bar No. 975703)
SOLOMON LAW FIRM, PLLC
1025 Connecticut Avenue, N.W., Suite 1000
Washington, DC 20036
Telephone: (866) 833-3529
Facsimile: (202) 688-1896
dgebhardt@fedemploylaw.com

*Attorney for Plaintiff Jamie R. Whitesel*

46